Good morning. Illinois Appellate Court First District Court is now in session. The Third Division, the Honorable Justice Margaret McBride presiding. Case number 1-7-2105, People v. Venice McCall. Good morning, everyone. This morning we are having the oral argument in this case, and I am with Justices Ellis and Justice Burke. The attorneys will be given about 10 minutes to present oral argument. After that time, each attorney will be then asked questions by the panel members. So with that, I'd like both the attorneys of record to identify yourselves first, and then we will begin. For the appellant, Jonathan Krieger for Venice McCall. Good morning, Mr. Krieger. Good morning. Good morning. I'm Assistant State's Attorney Justin Erb, and I'm here representing the people of the state of Illinois. All right, good morning, Mr. Erb. All right, we're going to begin then. Mr. Krieger, you may present your oral argument, but also keep in mind that we will also prevent you time for your rebuttal after Mr. Erb. Thank you, Your Honor. Good morning, and please proceed. Thank you. Good morning. May it please the Court. This case raises whether my client at the preliminary Krenkel inquiry showed trial counsel's possible neglect in failing to raise two suppression issues. My client met the low standard required, so it was error not to appoint Krenkel counsel. This case should be remanded. This morning, I wanted to discuss each claim against counsel in turn. First, counsel showed possible neglect by failing to challenge the Miranda violation. The centerpiece of the state's case was my client's videotaped statement when she admitted to killing two of the three victims and to witnessing the accidental death of the third victim. The statement was given after my client was arrested outside the home where the three bodies had been found weeks earlier. During the preliminary inquiry below, my client alleged that after he had been taken into the interrogation room, the police conducted an improper question first, warn later technique. According to my client, one of the detectives said that people in the neighborhood had been talking, saying that he had killed his family. My client responded that he himself had gotten shot, that he had killed somebody in self-defense, that his aunt was shot by accident, his cousin had grabbed the gun, they wrestled, and he might have shot and killed him. Only after the statement, the detectives Mirandized my client. My client also alleged that he told all this to his trial counsel. It was possible neglect for a trial counsel not to raise the suppression issue. It was, of course, ineffective assistance of counsel to not raise a meritorious suppression issue. And here, there was an improper sequence. The detectives interrogated my client, then they warned them, then they interrogated them again. And there's no dispute at this stage that my client was undergoing custodial interrogation. So under the Supreme Court decision in People v. Lopez, the use of this technique requires suppression if the technique was used deliberately and no curative measures were taken. And the evidence supports showings on both of those factors. In Lopez, the court found the technique would not be considered deliberate if either the detectives did not realize the defendant was a suspect or if the detectives were not planning on questioning the defendant. And neither of those apply in this case. My client had been arrested. He was in interrogation room. And the interrogation was specifically about this crime. They asked him about the killing. And in addition, there was no evidence the detectives were planning on waiting to question him. The case was already weeks old. He was the only suspect. So under the two considerations found relevant to the deliberateness analysis in Lopez, the technique used here was deliberate. In addition, no curative They were done in the same location with the same questioners. When the detectives didn't arrange my client, they mentioned the unwarned statement. And they never told him that his unwarned statement could be used against him. The state argues that my client's trip to the hospital between the two interrogations was a curative measure, but they provide no authority for this position. And it was really the same interaction. If you watch the video or read the transcript, the detective says you can either talk first or you can go to the hospital. And my client chose to go to the hospital, but then he came back and it's the same place and the same personnel. Under the Siebert decision, the question is whether the second interrogation is covering the same ground or a new and distinct experience. And I think a reasonable review of the record shows that this is the same experience. They weren't covering any new ground in the second interrogation. And because these allegations showed possible neglect, it was error not to appoint counsel on the Miranda violation. In addition, counsel also showed possible neglect by failing to move to have the physical evidence suppressed. My client's claim below was that the police needed a warrant to process the scene. The data bodies were found. The officers were brought to the Hermitage residence on a well-being check. No one answered the door. They called the came in through the windows and saw the bodies. Officer O'Donnell testified that they then did a protective sweep. And a short time later, an evidence technician arrived and they processed the scene. This involved taking dozens of photos, 48 of which were admitted at trial, over 70 pieces of physical evidence. It required disassembling, plumbing, the pee traps and the grates from the sinks. The search was illegal under Mincy v. Arizona. Once an emergency is dissipated, the police require a warrant to search the scene. There was no murder scene exception to the warrant requirement. Since there was no warrant, there was possible neglect for counsel not to have filed a motion to suppress. In addition, the physical evidence was used at trial to convict my client. It provided ample corroboration that he was indeed in the house, as he said he was during the video. The state introduced a hammer that was allegedly used to attack one of the victims. Photos show the victim's cell phones were all lined up, which corroborates his sister's claim that she had been trying to call the victims, and then they all went to voicemail at the same time. There were bloody rags, cleaning materials. My client's DNA was found on duct tape, a hammer, and a washcloth. And his fingerprint was found on a Windex bottle. Because it was possible neglect for counsel not to seek the suppression of evidence from this warrantless search, it was an error not to appoint critical counsel, and counsel should be appointed on remand. I'm happy to answer any questions your honors have now. All right. Justice Burke, do you have questions for Mr. Krieger? Good morning, Mr. Krieger. How are you today? Good. How are you? Good. Happy St. Patrick's Day. Okay, so I'm a little bit confused. If we could go right to your Miranda issue. You claim that there is a de novo standard. Where are you getting that it's de novo? There's no procedure that the judge erred on that I could see in your brief. Is that correct? That's right. If it were a procedural argument, there's no question it would be de novo. The Supreme Court hasn't spoken directly as to what the standard of review is for appointing counsel, whether there's possible neglect. Okay, so the trial court in this case took, she questioned the defendant, she questioned defense counsel, and then she made determinations after that. So that would all be factual determinations. Would you agree with that? I'm not sure. I would say it's a mixed, a mixed determination because the question is whether the facts amount to possible neglect. It's not like a credibility. How is that procedure? That would be a determination that's substantive, isn't it? Our argument is not that it's procedural. Our argument is that it's not procedural. I have to be manifestly erroneous. Is that correct? That's not accurate. And where are you getting that? We said it in our briefs other instances in the civil context and the post-conviction hearing act. The initial question is whether you can... Stick with me on a crankle hearing. On a crankle hearing, do you have any case law that says that the standard of review should be de novo on a court's determination on whether the attorney neglected the case? As to whether an explicit holding, no. But in the Chapman case and in the crankle case, if you look at how the U.S., the Illinois Supreme Court, excuse me, has reviewed crankle decisions, specifically the question as to whether appoint crankle counsel, they don't use language of deference. And so that's our argument. And then we do have arguments by analogy, which because the Illinois Supreme Court hasn't spoke on this, that's certainly a permissible legal argument, which is why I was raising civil context, post-conviction context. Got it. Okay. So just run with me for a minute. Let's just assume that the standard is going to be manifestly erroneous. So if it is manifestly erroneous, you agree with me that it has to be clear, plain evidence, undisputable that the court Okay. Motion to disperse is usually a matter of trial strategy. I would agree, but it needs to be a matter of sound trial strategy. Okay. So sound trial strategy, which leads me to my next question, that doesn't necessarily mean a winning trial strategy, does it? That's right. I mean, a sound trial strategy needs to be a reasonable one. I think in this case, there was a team of defense attorneys that were all three with the murder task force. Is that correct? I recall two at the actual trial. There was a team of three during her testimony. I could be wrong on that, but I did write that down. So there's three lawyers and the three lawyers conferred after meeting with the defendant. Do you remember that from the record? Yes. Okay. And that team decided that they would not pursue a motion to disperse on that. I'm not sure. I mean, I think initially... Well, I'm looking right at her testimony and testimony was the team of lawyers decided together that a motion to suppress would not be fruitful. Are you asking with regard to Miranda? Yes. Yes. Okay. But the attorney also didn't recall being told about the specific claim and that's rebutted by a letter that my client attached. So the decision to not file a motion to suppress on something that the attorney didn't claim to know about is not really one that one could deference to. Okay. So the decision that was based on the trial court, her testimony was she believed that a motion to suppress would have been fruitless. Is that right? Regarding a claim she didn't know about, yes. Well, you and I can beg to differ on whether she knew about it or not knew about it. This allegation was brought forward by the defendant in multiple ways. And I'll look at her testimony again, but I believe she did know about it and made a decision not to bring the motion. I believe that was her testimony. She did. So the question is, then if counsel determined not to bring it and didn't just blow it off, is that evidence on the book? Yes, because it was a no reasonable trial attorney would have allowed this, would not have tried to keep this evidence out. So unless they pursue the motion that you say would have been fruitful, they're deemed neglectful. Yeah. Possible neglect. That's the only standard. Okay. That's all I'm asking. As long as that we're on the same page that you are saying that this motion in your opinion would have been fruitful and therefore it was neglectful not to Okay. So let's talk about how this would have been fruitful. First of all, you are not claiming the first statement that was made to officer Ludwig, that he was afraid to go to jail was also subject to this question first born later, right? I think there are problems with that, but yes, my client did not raise that. So we're not challenging it. Okay. So that one is, you just blurted it out and you're not going to challenge that. I think it could be challenged because the, but you're not challenging. No, it could be, but you're not. Okay. So is that, I'm stuck with my client rates. Okay. All right. So let's go to whether this would have been fruitful. Tell me, Mr. Krieger, how this proceeding would have gone forward. If they had brought a motion to suppress the statement, correct me if I'm wrong, the state has the burden to go forward first. Um, yeah, I think we should just suppress a statement. Right. Yes. Okay. So the state presumably would have called the detective and, or both detectives and the detectives would have said consistent with their trial testimony that defendant blurted this out to them in response to the statement of the detective. We're hearing that you killed your family, right? Presumably. And defendant allegations that they would have refuted the allegations that they had pressed on defendant's injury on his arm and told him that once he said, correct me what the defendant said exactly that they had pressed on his injury and said that they would get a medical attention after he told them what happened. Yeah, there were allegations of physical abuse that we're not raising here. Okay. So the detectives would have refuted that. How would the defense have proceeded after the detectives refuted all of defendant's claims, presuming that the videotape wouldn't refute that or wouldn't establish defendant's claims? When you say that the police would have refuted that there's, there's no, there's no, um, I don't think that that's a fair assumption, fair assumption. This actually went to a motion to suppress the trial court would need to decide between the credibility of the defendant. So defendant has to put on some evidence. How would he do that? He would testify. Exactly. So once defendant would testify, he would then be subject to cross examination. Is that correct? That's right, your honor. And under cross examination, he would be asked about whether he was a billionaire and a rap star. I'm not sure. I mean, is that a likely cross examination question? There are cases that, that limits the scope of the state's questioning. Would he be asked if that was him in the video? I'm sorry? Would he be asked if that was him in the video? Um, I, I don't know. I mean, if that was him in the video confession, I think we're going a long ways away from this for a second. So if defendant was put on, on a motion to dispress and he would have basic questions about his prior statements, such as it was an actor wearing a mask who gave the confession, what would that do to defendant's credibility? I don't think it would do very much as a suppression hearing. I mean, this is, this isn't something that would come out at trial. I don't, I don't think that you can say because my client has a mental illness problem that he would automatically be discredited. And again, the only standard is possible neglect. So only standard is possible neglect and whether it was a trial strategy, could that not have been a valid trial strategy not to put him on at emotion to suppress? I don't think it could have hurt. I mean, you, you, you guess possibly you could have been, I know it's a hard job, but don't spit at me and tell me it's raining. So, okay, let's move on to the next thing. Let's talk about Lopez's decision of Siebert. Lopez's interpretation of Siebert. Okay. Lopez said in order to determine whether they use the question first, warn later technique, you had to several things, correct? Correct. The time between the statement, the pre-warning statement and the post-warning statement. I'm sorry. Are you asking about with regard to the curative measures or with regard to the deliberateness? I'm talking about the deliberateness of the options under people versus Lopez. We'll get to curative in a minute, but let's talk about the, the deliberateness. Okay. I'm sorry. No, you're doing fine. You're doing fine. That's the hard one. The time. So the time factor in this, you said it was a minimal amount of time between the pre-warning and the post-warning. Correct. So it was about two and a half hours. Is that correct? Yes, that's right. Okay. So how do you reconcile people versus Brannan with two and a half hours? Because Brannan specifically said over an hour between questioning goes against the intentionality of the question first, warn later. I think people versus Brannan is distinguishable in several ways, but it's wrongly decided with regard to the timing because in Brannan, the court seemed to think that it was significant that the two interrogations had happened closer in time to one another and that didn't show deliberateness. And that's not what, that's not what Lopez says and that's not what Siebert says. Okay. So Siebert, she was continually questioned for over an hour prior to receiving her warnings. Is that correct? I'm sorry. If you'll let me look at my notes. Go right ahead. My notes say in Siebert is a 35 to 40 minute interrogation. And then they took a break and then they immediately started questioning her again. She took a cigarette break. So it was approximately an hour of questioning with her prior to a warning. Is that right? Look, I don't want to intaginize you, but it said 35 to 40 minutes. You're not intaginizing me. And then it said a break. And so 35 to 40 minutes is 35 to 40 minutes. Okay. And then after the break, they questioned her for another 25 minutes. Right. Your honor. Okay. In this case, the time of, if we want to call it a questioning, the time was less than a few minutes, wasn't it? Yeah. That's right. It was brief. And then the place, I know you've said that it's the exact same interrogation room, but the place changed, didn't it? For two and a half hours, he was not contained in the same place. The question is where the interrogation took place and it did take place in the same room. You're right. There was an intervening. There was an intervening two and a half hours. Right. I'm sure there was some transportation time, but yes. Okay. And the circumstances of the questioning, the questioning in Siebert was extensive questioning regarding specific details of the case. Is that correct? 35 to 40 minutes. Yeah. I would say that's pretty extensive. Was there any questioning under any testimony by the officers that they questioned defendant regarding details of what he stated to them? No. The initial question, it was interrogation because they made a statement that was designed to elicit a response, but no. There was no questioning? There was interrogation, which is the relevant inquiry. Was it a question or was it a statement? It was a statement that was interrogation. Okay. Is one of the factors to look at in curative in whether the officers cured it, whether the questioning was narrower and shorter pre-warning or post-warning? Yes. That is one of the- And the questioning in this case was significantly shorter pre-warning and post-warning, wasn't it? That's right. Okay. Even under Siebert, I'm looking at Justice Kennedy's concurrence, which that one of the curative measures is a substantial break in time between pre-questioning and post-questioning. Is that correct? That's right, Your Honor. Okay. And then in People v. Lopez, it was about a two hours. It was about a comparable time as it was in this case. And the court in that case found that there was indeed a Siebert violation and there was insufficient curative measures. All right. Thank you, Mr. Krieger. I'm going to let you off the hook now. Turn you over. Justice Ellis, questions? Yes. Thank you. I think we're still in the morning, so good morning, Mr. Krieger. Good morning. I want to cover both of these briefly, but on the search, you say this was an unconstitutional search under Mincie, but what do you say to the response that Mincie was, if memory serves, a four-day search of the house where they opened up all kinds of things that were not in plain view. They opened canisters and drawers, things that weren't in plain view. They conducted a full search and just said, well, it's a crime scene. We can do that. And Mincie said, no, there's no crime scene, exception to the warrant. Whereas here, it seems as if everything that was spotted was spotted during a protective sweep that I don't think you're saying was improper and was in plain view during that protective sweep. So why doesn't the plain view doctrine alter your argument? Because I think it's speculation to say everything was cited during the initial protective search. Detective O'Donnell did not testify to that. It was a very extensive search. It required, as I pointed out, taking apart bits of plumbing. There was also the inventory shows that they also took doorknobs off. This was a very extensive search. I would also point out, after Mincie, there was an argument in the Thompson versus Louisiana case. They said, well, it wasn't a four-day search in Thompson. They thought it was about a two-hour search. And the court said, in Mincie, that wasn't the deciding factor. The real question was whether the emergency had dissipated and whether they had gotten a warrant for the later processing of the scene. And in both Thompson, which was that it was indeed an illegal search, an improper search. Now, with regard to plain view, I would also point out that in order to see something in plain view, Officer O'Donnell never claimed to see anything in plain view. So that doesn't apply. But even if it could somehow be the inventory, the evidence technicians' later arrival, if the argument is whether they could see it in plain view, I would say they need to meet the threshold showing that they were legally in a position to see the items. And they weren't, because they didn't have a warrant. In addition, the items used are not immediately incriminating. They're not drugs. They're not one-header box. They're not something, basically, contraband. And so that would be my response with regard to plain view. Well, in fairness to the officer, he was never asked whether anything was in plain view, right? Because there was no suppression hearing, and you're saying there should have been. That's right, Your Honor. But the officer did say that he didn't touch anything. He was just looking to see if there were more victims or maybe a perpetrator. I mean, you know, he walks and he finds three people dead, two people immediately. But he said he didn't touch anything. And then the evidence technician said he videoed everything. And doesn't the video tell us that everything was just lying out in plain view? No. I mean, the... By the way, before you answer it, let's take the plumbing out of this conversation. The plumbing was not in plain view. The plumbing of doorknobs as well? But, well, I don't know about doorknobs not being in plain view. The plumbing wasn't in plain view. The plumbing wasn't used against him, right? There's no reason to suppress the plumbing, right? I believe that a swab from the grate in the basement was. And a lot of the DNA evidence of some kind was taking some swabs. So I don't know that you could say that those were in plain view. If you were doing a protective search, you're looking for people, for either more victims or the perpetrator. You're looking for people. You're not scrutinizing everything. No, you're certainly not. But that still doesn't take away the plain view doctrine. The plain view doctrine says, if you see something in plain view, it's not a search. If you were already there for a warrantless but appropriate reason. That's right. And in this case... Go ahead. The evidence technicians weren't there for proper reasons since the emergency anticipated. But don't we typically impute a feeling of collectivity between the evidence technician can't come in and expand the search, but he can do everything that the initial officer could have done, can't he? I think we do usually impute the officer's knowledge between different officers. In this case, doing so would do serious damage to Muncie versus Arizona, though, because in that case, as long as you sent in an evidence technician and they could have done it for four hours, and as long as all they did was not disassemble anything, then they could avoid a warrant requirement. And obviously, there should be holdings that would follow up these kind of projections. Okay. All right. Let me ask you about the Miranda issue. So your focus in this appeal is on the unwarned statement that you say was the product of a custodial interrogation, that your client said was the product of a custodial interrogation before the camera comes on, right? I mean, the focus with regard to fruits is not that, but that's... I don't think there's any question the initial statement shouldn't have come in because it was later videotaped, and the statement should be suppressed as the result of an improper technique, if that makes sense. But when we talk about question first and warrant later, the question first in your mind is the question that occurred that we don't have on camera, right? That happened before they entered the room. That's correct, Your Honor. Okay. Don't we also have a question at custodial interrogation on camera before Miranda warnings are given? I mean, before Miranda warnings are given, the detective mentions his previous statement, but my client doesn't respond in an inculpatory way. So I would say there was an attempted interrogation, but then it was interrupted by the Miranda warnings. Perhaps you're referring to a different moment. No, I'm not, but I have to say I'm surprised by your answer. I remembered the video, the police officers walk in, they say to him, you know, Officer Suds puts his leg up on the bench, and he says, okay, first of all, before we do anything, a minute ago, you told me that whatever happened happened in self-defense, and he said, yeah. Yes. Yes. Yes, you're right. That would also count as a custodial interrogation. Am I remembering that wrong? No, I'm sorry. I didn't remember my client's response. I remember Detective Sudarsu's statement to him, whatever happened happened in self-defense. I didn't remember that my client had affirmed, but yes, you're right. You're completely correct. That would be another instance. I'm just looking at the transcript myself, but I'm sure you're right, and I do remember him putting his leg up there as well. Yeah. Okay. Yes, he says yes. So there were two unwarned admissions. Well, one we have on video, and one we don't know. Maybe, you know, maybe, maybe not. Does that factor in? Does the number of times he was asked before he's warned factor in to the Siebert analysis? The extent of the pre-warning interrogation? Is it relevant to our consideration that he was one time on video for all of us to see, questioned without Miranda warnings on this very point, and another time, possibly, possibly not. We don't know at this moment because, you know, there was no evidentiary hearing. Does that make a difference? Go ahead. Sorry. It does make a difference. Although you're right, perhaps I should have done a better job arguing that the initial statement before the warning was itself the Miranda waiver itself, which is that the detective was taking something that he had as part of the warning process, and that indicates the kind of continuity of conduct, which shows a lack of curative measures. It indicates a continuity, which, yes, which doesn't indicate that it's deliberate, but it certainly indicates that they didn't do the problem. What do you say to the argument that there would have been good reason not to move to suppress any of these statements because self-defense was the only thing they were going to be arguing, and so why suppress confessions to self-defense when that's going to be your theory of the case? I think, I mean, they had the theory of the case that they had because the video was allegations of self-defense. There were problems with the video. My client gave contradictory statements in the video, and without the video, it really, that would have robbed the state of a really key part of its case. They wouldn't, basically what happened would have been a black box. No one would have known. They would have had the physical evidence if that weren't suppressed. They would have had that my client was in the residence based on his calls with his but in terms of whether, in terms of supporting a claim to self-defense, I think if the video was out, they could have just raised up a straight, a straight challenge based on reasonable doubt that they didn't, you know, prove that my client did it beyond a reasonable doubt because they wouldn't know. Would that have been a, and was that a realistic possibility to raise a reasonable doubt defense here? I think with the videotape coming in, no, it wasn't, but if the videotape were suppressed, I think it could have been. I'm saying that I think courts have recognized that strategies shift as evidence, you know, comes in and comes out, and if it were suppressed, if the videotape were suppressed, it might have led to a different trial strategy. All right. Thank you very much, counsel. Thank you. All right. So, I have some questions. It's a very interesting case. So, Mr. Krieger, one of the things you began with is this possible neglect, but that doesn't really answer the question here because possible neglect is not simply something that comes about because a defendant makes a claim or suggests something to his or her lawyer. Is that true? I'm not sure. I mean, if the claim depends largely on the defendant's word and the defendant's proposed testimony, it might be enough. In this case, there was some corroboration that he'd made a previous statement with what he of a pre-warnings, pre-video statement, although the claim there is spontaneous. But at the end of the day, even if there is this pre-statement without a warning, the attorneys have to make an effective decision about whether or not to file a motion to suppress. Isn't that the law? Lawyers have to make that decision. Yes. It's a decision that would be made by the lawyers rather than the defendant in particular. But in this case, they consulted. I mean, at the Krankel hearing, I think you said she didn't remember, but Ms. Yee testified at a previous Krankel hearing, didn't she? I don't think we should consider that because the statement was out of order. I'm not considering it, but this was a few years later, and there might have been some statement by her that she didn't remember everything exactly. Okay. What about the basic standard when a judge is looking at ineffective assistance? Are we still looking to determine whether or not that the strategy was not effective and that prejudice occurred? That would be the ultimate strickland standard. And in the more recent case of Rodas, the Illinois Supreme Court talked about how motions to suppress, well, they're generally trial strategy, aren't they? Yes. Again, it needs to be a reasonable trial strategy. Sure. Okay. And in that case, the court said that every single case still has to be looked at on the individual facts, case by case basis. Is that true? Of course. And that the trial judge who presides over the hearing can look at the whole picture. They can determine the facts, and they can determine whether or not there's a legal basis or sound basis for the motion to suppress that the defendant says should have taken place in this case. Is that true? That's right, Your Honor. In Rodas, the question was whether you could consider both the legal aspect and the factual aspect of the claim. The court said, yes, you consider the whole claim, but you do so through the lens of possible neglect or whether it's patently frivolous. All right. But they also pointed out that just because a defendant says, they did this, they asked questions first and then they warned me, I want a motion to suppress. That is not how we determine possible neglect, is it? Because the court said, the Supreme Court said, if that were the case, any time a defendant says a motion should be filed, the motion has to be filed. That's not the standard, is it? But just because a defendant says a motion should be filed, it's possible neglect. That's correct. That kind of statement would warrant an inquiry at the crankle stage, where the court would ask for more details. All right. Now, you said that the centerpiece of this state's case was the statement. Do you really think that their case was the centerpiece, was his statement that he killed these three people, well, two of them in self-defense? The video statement, yes. Yes, it was. That's what they relied on for what happened inside. Let me take you through the evidence. Well, let me ask you this. If the trial judge reviewed everything, looked at the record, heard the lawyer, and then decided that this motion was not going to have merit at the end of the day, did she follow Rodas? Yes. The question is possible neglect. It's tricky. I think if you find that claim really has no merit at all, and obviously there's no neglect in raising it, but you don't do a full circle in an hour. Maybe I'm not getting to where I want to go. If you can't show prejudice by the lack of filing this motion, are you out of the box? I'm sorry, I don't know what out of the box means. I lose? Yes. I mean, can the court say this is not going anywhere if the motion was not filing the motion wasn't ineffective, but you can't establish that the outcome of this trial without this self-defense statement would have been any different at all? I don't think I need to establish that. That's not possible. I don't understand. Why don't you have to show, like in the typical case, there are cases where a motion is suppressed if it wasn't filed, and it should have been, and the defendant still has to show the outcome would have been different. Otherwise, you don't have ineffective assistance. It's a two-pronged test. No, it's a reasonable probability standard. All right. Reasonable probability. Let's take that one. You think that this evidence here shows that if we take out the evidence completely, you're saying that this trial would have had, there would have been a reasonable probability of a different outcome? I don't need to make that showing at this point. Well, you just said you did. It's only a reasonable probability. I said it's a reasonable probability to show a full Strickland claim. That's what happens at a full crankle hearing when the attorney has been appointed to assist the defendant. Then the question is whether they showed an effective assistance of consequence. All right. So you're saying there's no Strickland claim here at all. It's really just something else. No, I would say it's a preliminary stage of a Strickland claim. The Supreme Court has said there's an inquiry stage. Then there's a full crankle hearing. At the inquiry stage, the only question is whether crankle counsel needs to be appointed. The standard for that is possible neglect or whether the claim is patently frivolous. My argument is the attorney will eventually need to show that. I'm sorry. I'm sorry. I'm sorry. I don't know where you're getting patently frivolous from. That's not sufficient. Okay. So at the end of the day, this Rodas case says if the trial court determines that these were matters of trial strategy or that the claim lacks complete merit, the court can do what the judge did here. She said, I'm not going further and appointing counsel. Isn't that what Rodas says? Yes. I don't remember that exact language, but I think lacks complete merit is a great way of putting it. They said lacks complete merit. They just said if the judge determines that these are matters of trial strategy or the claim lacks merit, and then they went on to say the claim lacks merit means factually and legally the judge can deny going further or can say, I don't need to, I'm not going to appoint counsel. I think that's what Rodas says. All right. So once again, we're at a motion to suppress, which is traditionally a matter of trial strategy. Isn't it? Yes. Okay. Now the judge in this case, I think first asked the defendant, what are the six or so claims that you are claiming resulted in you not getting confident representation? And we're only talking about the two here, the evidence recovered at the and then the motion to suppress, right? Those are the only things that you're talking about here. Correct, Your Honor. Okay. All right. So I want to go back to the evidence in the case, because you say the state centerpiece was this statement. But if you look at the evidence, and let's assume now in this scenario, that there were things in plain view. Okay. I know you're challenging that, but in plain view, we have a lot of blood, right? And there was a washcloth that was in plain view, wasn't there? There were several washcloths, yes, Your Honor. Yes. But at least one had the defendant's DNA on it. If I'm correct, I believe two did. Okay, so two. And then there's DNA on a fingerprint or something. Which is on the Windex bottle or something? The fingerprint, Your Honor. Okay. You got three dead bodies, true? Correct. They're all covered, correct? That's right, Your Honor. There's gunshot wounds in every single victim's body. That's right, Your Honor. You got two witnesses that put this defendant in that house at the time of the murders. Two witnesses, right? Eddie Conner. And the sister of either the defendant or the- Jackie Jones. Yep. My client's sister. Okay. And both of those people say he had no injury on his arm at the time they saw him shortly after what would have been these deaths. Correct, Your Honor. Yes. I think that's how the timeline works. Okay. So forget about his statement completely. Oh, I'm sorry. The statement that he made in the police car where he said he volunteered that statement. Isn't that right? The words came out of his mouth? Yeah, he said it, but it was in response to something that the officer said. I don't think you're right. I don't think so. I think that he said something to the police officer. How long have they been looking for me? Didn't he say that? I thought- How long have they been looking for me? I thought- He said, why? Or something. And he said, because I don't want to go back to jail. And then the officer said, why don't you want to go back to jail? And he goes, because that's what they do to people when they commit murder. As I said, it was in response- That this little discussion started with the defendant. But you know what? Let's throw out that statement. All right. So you've got DNA. You've got three dead bodies. They're found about a day later. Okay. They had been shot the day before. True? Yes. All right. You got people that put them in the house at the time. You've got his DNA. And then you've got evidence evidence in the house clearly devised to hide what was really going on. Don't you? That there was cleaning supplies you mean? Yes. Absolutely. Who was ever in there covered the bodies. They put phones in separate places. The murder weapon was actually put back into a holster. True? That's true. Yes, Your Honor. So would you say that that evidence is probably the most damaging circumstantial case of three dead bodies that you've ever seen or read about? I don't know. I haven't had many multiple murder cases, but no, this is not very damaging. There was no eyewitness to the crimes. My client's video statement provided far, far more detail than anything else. I'm taking out the statement. You have someone who's in the house. Oh, there was testimony that there was a contentious relationship between the defendant and McCulloch Jr. Right? So the state could have tried this case straight up without any statement. And you're saying that that's a close case. I don't need to show that it was a close case. I know. The judge reviewed everything and says on the merits, facts and legal merits, this is never going to change anything. You're saying the court can't do that at this pre-trial hearing? I think the standard is possible neglect. I'm sorry to repeat myself. What does possible neglect mean? I mean, give us a definition. Are you saying that's no longer ineffective assistance? What is it? It's a threshold showing before you have to show full ineffective assistance at a full crankel hearing. And so possible neglect means, I mean, neglect is similar indeed to deficient performance. What we would say is, you know, first promise strickland. But then there is also a, the modifier there means you don't need to show that deficient performance and you just show that it's possibly deficient. So you've narrowed it into only one prong. Possible neglect is possible deficient performance. Who makes the call? The judge? The judge makes the call and then your honors review it. All right. And how do we review it? Well, our position is that the review is de novo because when the Supreme Court has reviewed our prankle cases substantively, they haven't used the manifest error or abuse discretion standard. And that this, because this is a preliminary finding, even though it does involve the facts, because it's a threshold showing much like in some civil context or at the first stage of a post conviction, um, it's, it's just a question of whether there's, um, there's enough to get by. It's kind of like a primary issue showing, and those kind of showings are reviewed. Okay. Now at this hearing, the crankle hearing, the judge went through each single issue with Ms. Yee, didn't she? That's correct, your honor. And do you recall what Ms. Yee said about why they didn't file a motion to suppress? Um, so there was a question, um, I'm sorry, are you asking about the Miranda or the wireless search? Oh, I'm sorry. I'm asking about the Miranda issue. Yes. My recollection is that, um, counsel Yee made some kind of reference to confidentiality and said it's a HIPAA thing. And the court said you can give a limited response. And then Ms. Yee said, we talked it over with our team and my client was the only one who wanted to go ahead. So we didn't file it. Okay. So does that show possible neglect? If it's an, if it would be an unreasonable, um, or an arguably, I'll stick away from arguably, possibly neglectful, um, act to do so, yes. Okay. All right. So let's talk about that then. Here's what happened at that hearing. This is what Ms. Yee said. She said that they had definitely contemplated whether or not to file a motion to suppress the statements. She said that, uh, she met with him. Actually the team met with him. They had the videotape of the statement. Do you recall that? I don't recall this happening. I'm sorry. I do recall this thing being a different, my recollection is that they went over the videotape with him to talk about whether or not to file a motion to suppress. Yeah. I think that that was a question as to whether the tape was, was, had been, has been messed with as my client alleged. But yes, if you go over it, you go over it. I agree. Well, they went over it with him and he had told them a couple of things. He told them that, uh, the police officer was grabbing his arm during the video. Didn't he say that? He alleged a lot of abuse. Yes. All right. Well, we have, I want to talk about it. He said that the tape was doctored, that they had deleted things from the tape. Didn't he say that? Yes, he did. And didn't Ms. Yee say that they went through the entire tape with him and the time clock showed that there was never any deletions. Didn't she say she discussed that with him? I don't remember that. This isn't the claim we're raising. I don't remember. I'm sorry. All right. Well, these are all things that go to whether or not there's possible neglect. Then she said that he said, uh, and they went through this. They showed him that there is no deletion here. The time, the time is running on the tape by minutes by seconds. I don't know how long it lasted. Do you? It was, it was a while. I think it was, but there's no evidence of deletions. Okay. That's what she said. She's the lawyer. It's in the record. And I think the record shows that as well, that the time goes from seconds to minutes to whatever it was more than an hour. Yes, Your Honor. I certainly would have raised that issue. I, but that's my point is that they have to look at the whole picture. All right. So he says they're grabbing him. They say, no, there's nothing in there that shows he says that they doctored it, but there's no evidence that the tape was ever done. Then he says that they put another person in that video. It's not me. Okay. Now this is their client. He is telling them that they put a mask on someone else and that that person is portraying Venus McCall in the video. That's on the, that's in this record. Are you aware of that? Okay. So Rodas says that it's not simply a defendant saying that this is a motion that in this case, it's not just one lawyer, it's a team. And they went over everything with him and they decided that there was not a good motion to be had. Are you saying that that is possible neglect? Yes, Your Honor. And what is that based on? Who makes the decision? How do they make a decision? I just, I just told you, Rodas says it's not enough for the defendant to you should file this motion. Who has to look at it and make a determination of whether or not to file something? Well, the trial counsel is obviously the one who makes the decision, but the decision isn't immune from any review and my client. But we're reviewing it. We're reviewing it now. And so you're saying that based on this entire record, there's possible neglect when a lawyer says, Hey, listen, we went over the tape. We listened to what he had to say. We reviewed the case law and we made a decision not to file this motion. And now you're saying that's possible neglect. But, but the counsel didn't, you're, you're, you're speaking about a different claimant. Counsel didn't remember whether the client had raised the, um, the CBER claim specifically, even though a letter showed that it had. And so they're making a because it was a little bit off that day is, is, is showing neglect when she went through every single thing that he talked about and how they went through the tape. You're saying that's possible neglect because she didn't specifically say we rejected CBER. I'm saying that if you want to, if you have to make a trial attorney, making a decision on whether to file a motion to suppress, you have to know what your claim is. And so if she was addressing, she thought she was only addressing these claims that were obviously, you know, um, the result of my client's mental illness, but that's a different decision to be made than, than a CBER claim, which is. I don't know why you're interjecting mental illness in this. Just with regard to his claim that it was, that the tape was and the mask. The lawyers have to consider all that before they decide to, to go forward with the motion and put somebody on the stand that will then be locked in, locked in for trial. If he says they, they put somebody else in that video instead of me. So you're saying that that's possible neglect when they know if they locked him in at a motion to suppress, the defense of trial is locked in as well. I don't, I don't know that that's the case. I mean, you're, my client didn't testify at trial. And so I'm not sure how being locked in would, would make a difference. Well, if he testifies at a motion to suppress, there's going to be limits on what they can do. There's going to be limits on how the state can, can question him. It's not a fishing expedition. So he, if he kept his testimony to the specific claims that were being raised, um, I'm not sure that that would add that much, um, kind of ammunition for the state when it comes to trial. Okay. Now, do you agree though, that Rodas allows a trial judge to review everything and decide whether or not there's possible neglect? That's right. And the judge gets to determine whether or not looking at the whole picture, that this idea of self-defense is the only, it was going to be the only thing. Okay. That's not what I'm raising. I don't understand the question. I'm sorry. Okay. I'm thinking about Rodas and what it says. It says, this is their most recent pronouncement on Cranker, pre-Cranker. They say if the judge determines that there's, that these are matters of trial strategy or the claim lacks merit, the judge can make the call. What I'd say is let's look at the judge's call in this case, which is in the, in the ruling and the motion to reconsider. Um, she said that it was equally plausible that the, my client's statement was, um, the result of improper interrogation and that he said something spontaneously. And so that's, that, that to me doesn't show that this is a, um, a dead being loser. Um, it shows that it's something that shows exactly what the standard is, which is possible neglect. Okay. So you're saying because she said something else at the motion to reconsider that we shouldn't be considering what she said when she actually denied the request for appointment of counsel. She said very little specific in her initial rulings. Okay. And didn't, didn't she point out, or actually at some hearing, wasn't there evidence that the, uh, the statements made to, to the detectives were spontaneous. Yes. In a police report, it was, they, they referred to a spontaneous. I think, I believe that's what judge Reddick was, um, was picking up on when, when she rolled on the motion to reconsider. Okay. Let me ask you about this. I, you know, there are a lot of facts here. So I, I, how did the arm situation ever get to the police officer's attention? The arm situation. Yes. Okay. So he gets, he's arrested for the criminal trespass. He's in the car squad car with the one police officer where he says, you know, I don't want to go back to jail. That's what they, you know, I, that's what they do to people who commit murders. Okay. Then, then he's, he's in the station and there is an indication that he said something about his arm. How did that come about? Well, in one of the letters that he writes to his attorneys, he says that he was complaining about his arm because his arm hurt and they came in and they said, calm down. And then that's when this, um, that's when they said people are talking about you saying that you put your family. Okay. Then what happens? And then my client makes a statement about how his aunt was shot by accident, how he shot someone, the wrestling over the gun. Okay. So that's the statement for the Siebert slash Lopez case law. Right. Okay. So there's another officer involved. Oh, and, and you know didn't miss you say, didn't she say at this hearing where you say the Siebert thing isn't really considered. Didn't she say, and maybe I'm wrong. I thought she said, there is no doubt that as soon as he was given his Miranda warnings, he waved them. Did she say that at the hearing with judge, uh, I'm sorry. I don't remember. All right. If you said that, my recollection could be wrong. Okay. So what you have is he's made one voluntary statement already to one officer. Then apparently I'm talking about the squad car. Remember he says, he's the one that asks. I, I, I think my recollection is clear on that. He's the one that says, how long have you been looking for me? Okay. So forget, forget about that statement. Now we're in the, we're in the, this other thing with Sudarski and I believe car. So did that statement take place in an interview room, as far as you know? Yeah. Or was that when they were bringing him into the interview room? Or do you think, according to my client's allegations, they were in the interview interrogation room. Okay. But somehow his arm, he mentioned his arm before any of the, at some point he mentioned his arm. According to my client's letter to his attorneys, and I believe these allegations were also in one of the proceedings, although he was complaining about his arm, his arm hurt him. So he was calling out. Okay. And, and the, the, the theory is, is that then one of the officers Sudarski said, we hear that the people in the neighborhood think he killed your family. And then he made a statement briefly about self that he, you know, it was all self-defense. That's not what, that was part of the statement, but he basically. Okay. All right. But then, then he has given Miranda warnings. That's right, your Honor. So there's one set for sure. Given Miranda warnings on video tapes, we know that. All right. And then he says, he, he says he understands his warnings and he wants to cooperate or whatever. I don't know his exact words, but he wants to go get his arm treated. That's right, your Honor. They gave him a choice. Do you want to have, do you want to talk first or do you want to go to the hospital? He says, I want to go. Okay. Okay. And then he does go to the hospital. Correct. He gets treatment. All right. And there's about a two and a half hour span, but he, and then he's brought back to the police station, right? Correct. Return to the interrogation. Okay. And then he's given his Miranda warnings again. No, he's not. They made a passing reference to the Miranda warnings. They said, do you remember when my partner said, you know, about your rights? He said, yes, I remember. He's not Miranda the second time. Oh, okay. So just the first time that he agrees to talk later, but he wants his arm taken care of. And then the next thing is there's really no Miranda warnings at all. That's right. There's a passing reference to him. Passing reference. All right. And then he makes a statement. Correct. All right. And you're saying that based on that and his statement that he wants a motion to suppress that this is evidence of possible neglect. Yes. And you're saying that, that there's absolutely, that there's no curative thing here at all. This is not, they didn't cure anything. No, there's continuity and questioners, the personnel, they used part of the unwarranted statement as, as, as, as part of the Miranda waiver. Um, they never told him that his unwarranted statement couldn't be used. Those are all the things that courts look to with regard to curative measures. Well, there's, there's no requirement that, that they tell him that they, you know, that he doesn't have to make his statement and that, that it could, it doesn't. Well, I mean, there's no requirement for that, is there? No, Seabrook. I mean, Seabrook this one. Exactly. That's correct. All right. And in Brannon or Brandon, I don't know the court sort of de-emphasizes that completely. Don't think I don't. So Brandon, I think Brandon mostly focused on the time element and the extent of the, um, that it was a short question at the beginning and a longer question at the interrogation. Okay. Uh, I don't think I have anything further. Edwin. Okay. Sure. Uh, just one question, Mr. Krieger, in order to bring a motion to suppress guns, drugs, a statement, anything, you have to admit that you possess those things. Is that correct? No. The statement was yours. So I'm sorry, in terms of, uh, I think it depends on the fruit. So you're asking about a statement. Statements, guns, drugs. It's the same rule that you, in order to have standing to bring that motion, you need to say, I possess it. I possess the guns. I possess the drugs. The statement was mine. That's not correct. If you're, if you're not, I'm sorry. Tell me why. Um, if you're, if, if the police stop, um, a car that you own, you're driving and they find drugs in the back, you don't need to say those are my drugs. The, the, the, you have a privacy interest in the car. And so it goes, it goes along with that. Right. But you have to admit that the car was yours in order to bring a motion to suppress any, any criminality that was found in that car. I don't think you need to testify to that, but you know, secretary of state records or something to show that it was yours. Okay. And it would be the same for a statement. You have to admit that the statement was yours. I don't, I'm not sure that you'd need to, um, get up on the stand and admit to it, if that's what you're saying. I think to bring the motion before you even bring the motion in order to have standing to bring it, it has to be yours. I mean, a person's statement is, is inherently theirs. If that makes sense. Okay. So let's say you say that's not my statement. I never spoke to them. I never saw them. Would you have standing to bring a motion? If other evidence showed that it was in fact your statement, then you would. Okay. So you could contest the, uh, that you never, ever said it. Yes. I think in the context of the motion to suppress. Yeah, I think in the context of, of, of other fruits, I mean, that happens all the time. You, you challenged the suppression of drugs or guns, but then a trial, you say they weren't mine. Okay. Thank you, Mr. Kruger. That was it. Thank you. Just to sell us any more for. All right. Thank you, Mr. Kruger. All right, Mr. Herb, you may proceed. We're going to give you 10 minutes and we'd like you to keep by your time. Thank you. Go ahead. Thank you. Good afternoon. Your honors counsel. My name is assistant state's attorney, Justin Herb, and I'm here to argue on behalf of the people of the state of Illinois. May it please the court to begin. This court should review the trial court's decision to dismiss defendant's crankle claim, but only if it finds that the court committed manifest error in its reasoning, not as defendant argues a DeNovo review. Illinois case law, both from this court and the Illinois Supreme court have been clear and consistent that a DeNovo review should only commence where a defendant raises a procedural defect with the hearing itself, not where the case was dismissed on its merits as is the case here. A defendant does not raise any issue with the procedure of the hearing. And therefore this court should only reverse if it finds that the court's decision was clearly evident, plain and indisputable. Moving to the merits of the dismissal. Defendants asserted at the trial court level that the assistant public defender was ineffective or showed possible neglect by failing to suppress his confession because it was the trial court was clearly within the boundaries of good judgment by dismissing them. Even according to defendant's version of events, he was asked, he asked to go to the hospital. The police responded with a question about how they, I apologize, a statement that they heard he killed his family and he responded with a brief summary of what he did. Then he was giving the Miranda warnings 10 to 15 seconds later. He was then taken to the hospital where his arm was treated by doctors and then he was transported back to the police station where he was reminded of his Miranda rights and then proceeded to give a far longer, far more descriptive confession. Under Siebert, the people are prohibited from entering a confession where the police intentionally induced the defendant to make a confession without being warned of his rights and then intentionally given the warnings and then induced confesses again and no curative measures were under this. Under either criteria, the confession was submissible. First, the police officer's behavior during the interview clearly demonstrates that there was no intent to engage in this tactic. The bulk of case laws or any question first, warn later tactics show that the police will induce the subject to make a long detailed confession where they can wear them down and settle exactly what the statements they want to give the court would be. Then give the warning and then quickly thereafter give a more streamlined digestible version of that concussion. In this case, you can see the opposite happened. The defendant had a brief conversation with the defendant and then after the warning and then after the trip to the hospital, gave a far more detailed, much longer post-warning confession. Furthermore, the fact that the police took the defendant to the hospital before taking his post-warning confession is clearly probative that they did not intend to engage in a warn first, question later technique. If that had been their intention, it would make little sense to obtain a pre-warning confession, then take him to the hospital where he is in a far less coercive environment, where he has hours to reconsider whether he wants to talk to the police, has the opportunity to speak to doctors and nurses, and then take him back to the police station and try again. It would have been far easier to just do this all in the police station where it's close in time and in a more coercive atmosphere. Second, even if the police had intentionally engaged in this tactic, they took sufficient curative measures to make sure that the confession was not the result of coercion. It's a large take and break in time from the initial conversation to the second conversation and they moved to a second location and they reminded the defendant of his Miranda warnings and asked if he knew that they still applied. Any coercive effect of the technique clearly was cured by the time defendant gave his actual confession. Finally, under the Supreme Court's case in Rodis, the trial court was well within its rights to consider both the factual and legal merits of defendant's case when making its determination. As this court is aware, a defendant gave a statement to Officer Ludwig in the police car where he admitted that he was afraid of going to jail because he killed somebody. At that point, the court was within its discretion as making a fact finder and considering everything that it heard at trial, which it was allowed to do, to consider whether when the officers mentioned, you said that you killed your family, right? And the defendant said, yes, that's what they were referring to rather than defendant's allegations. Therefore, the court was correct to reject the defendant's argument. As to the search and seizure claim, the court was again correct to dismiss defendant's claim. The facts are undisputed. The police were called to defendant's home as part of a welfare check. After several attempts to contact McCullough's inside the house, they called the Chicago Fire Department, who was able to open the window into the side of the curtain, and they saw what was clearly a murder scene. There were several dead bodies in the house that had been partially covered. From here, as the defendant does not argue, the police clearly were well within the boundaries of the Fourth Amendment by being present within the house. There was an emergency exception to the Fourth Amendment that clearly applied because they saw dead bodies on the floor. Once the police were lawfully within the house, Illinois and United States Supreme Court law is very clear that they are permitted to observe and seize any material that is incriminating on its face in plain view. The evidence seized here after the first search included corpses of defendant's victims, murder weapons, objects covered in blood, and cleaning supplies that were clearly used as part of an effort to clean up the scene. All the evidence here is clearly incriminating on its face, and they show that a murder took place in the house and somebody attempted to cover it up. This case is controlled directly by People v. Ramsey, which is very similar on its facts, where this court held that when the police enter the home under an emergency exception to the Fourth Amendment, they may observe any obviously incriminating evidence in plain view, and a police technician may come in after the fact and photograph and seize that evidence, which is the case here. Therefore, this claim also clearly lacks legal merit. The trial court did not commit a manifest error by denying defendant's crankle hearing, and for that reason, this court should affirm the court's decision. Thank you, Mr. Earp. All right, Justice Burke, do you have a question? Mr. Earp, this wasn't just a triple murder. This was a murder of a police officer, so I would imagine these officers talked to the patrol officer before they ever saw the defendant. Is that correct, or is that what you would assume? Your Honor, I don't know if I'm following your Did the officers know about defendant's initial statement to Officer Woodward saying, I don't want to go to jail because that's where you go when you murder people? Your Honor, I believe that's exceedingly reasonable. Okay, so they are investigating somebody who has already confessed to another officer. Why would they say one word to the defendant? Absolutely no sense to me. Your Honor, I... A little bit far field of our issue, I know, but it just, it is so sloppy on a triple murder of a police officer. It defies common sense to me. Your Honor, as the trial court noted in its findings during the dismissal here, it is, when they said it is equally likely that the defendant spoke to the police first, I believe the trial court was speaking about Officer Ludwig and what he said in the police car. It's at least equally possible, if not more possible that, or more likely, that defendant spoke to the police first. The police said, wait a minute, let's get the video set up. Let's give your Miranda rights and then spoke to him. Okay, so, but on the video, and you'll have to, pardon me on this one, I haven't been able to see that actual video. I've just read the testimony regarding the video. So, in the video, does not the officer come in and say, well, we Mirandized you before? Your Honor, that, as I recall, that was after he went to the hospital, but it. Right, after he goes in the hospital, so the video says, well, we Mirandized you before, and you remember that and you waved, or to that effect. Is that correct? That's my recollection, Your Honor. And they do not re-Mirandize him at that point? Not to my recollection. I have no other questions, thank you. Justice Ellis? A few. So, let's nail this down, counsel. The first thing that happens when the video is turned on, after some blackout, is the defendant is sitting there alone. Then two police officers walk in. One of them is Sadarsky, if that's his name. I'm not trying to mispronounce it. I just don't remember. He always called himself Officer Suds, Detective Suds. Detective Suds walks in, another detective walks in, and the first thing that Detective Suds and the defendant say to each other, I think it's, how you doing, good man? He says, okay, first of all, you told me a few minutes ago, whatever happened, happened in self-defense, right? The defendant says, yeah. And then Detective Sudarsky says, okay, now we have to redo your Miranda rights. And his partner pulls out his car and reads the full Miranda rights. Isn't that how the video goes? That is my recollection. So, we don't have to speculate whether the police took an unwarranted statement from the defendant. It's on the video, isn't it? Yes, sir. Was that a Miranda violation? Your Honor, in terms of a Miranda violation, it was, defendant likely gave a un-Miranda-ized statement to the police. In terms of a Miranda violation, as in, did the police intentionally engage in a question-first-or-later technique? Your Honor, the people would dispute that in terms of the violation. Yeah, I know. I didn't ask you about Siebert yet. Was that a Miranda violation when they asked him that question and he gave that answer? Your Honor, if the, if the, if the police induced the statement from the defendant, then it would not have been admissible in court. Is there some reason you don't want to answer it the way I'm asking it? That would be a Miranda violation. Isn't it? I mean, it's a, he was in custody. He was in an eight-by-eight-foot room. They asked him a question that I would defy anyone to tell me that wasn't an interrogating question. He said, you told us a few minutes ago that you, whatever happened, happened in self-defense, right? And he says, yeah, that's a custodial interrogation, right? Your Honor, I misunderstood the question. That would be a Miranda violation. And I'm not trying to come down on you, counsel. I'm not trying to trick you. I just want to understand where, where, where you stand on this. That question and answer was a Miranda violation, right? Yes, sir. Okay. So there was an unwarned admission before he was Mirandized. There, there, there was also something that happened before the camera comes on. And I think that, I think the trial judge has a good point here. She says, I don't really know what happened. You know, maybe he just blurted it out. Maybe that was also the subject of a custodial interrogation. She, she doesn't know that. The defendant has his view, but she doesn't have to believe his view, but we have one for sure unworn statement before the Miranda and possibly two, right? Yeah, sir. Okay. Did the public defender who was probably at a bit of a disadvantage because some time had passed, did she articulate a, um, a strategic reason for not moving to suppress? Okay. Your Honor, by the, the, the reason that, uh, as a public defender, he chose not to suppress the statement is because she found that, that it wouldn't have had merit, um, to the extent that the initial statement may have violated Miranda and would have been, uh, inadmissible that that's possible, but considering that it was instantly that he was warned and then he gave a much longer statement after that, uh, it w it wouldn't have merit. Furthermore, uh, assistant public defender, he, um, that given defendant's statements to her, what he put in his letter and the statements that it was somebody in a mask that they, the, um, video had been improperly doctored, uh, considering that information, uh, APD found that it would have been that it wouldn't have benefited her client to raise that motion to suppress. Oh yeah. I mean, I can think of that reason, maybe other reasons why she might not have done it, but did she say any of those things? I mean, Mike, you can correct me if I'm wrong, but it's been a while since I read the transcript, but my memory is that she, she didn't remember she worked. She had some memory of the video. And again, I'm going from my own memory. So maybe I'm wrong, but my memory is that her memory of the video was wrong. And she didn't see what happened at the beginning of the video. She just didn't remember, which is not to indict the pro the assistant public defender. She just couldn't recall, but at any point, I believe she did say decided not to move to suppress, but did she ever say, why did she say we decided that self-defense was the only strategy? Did she say, well, we thought that the defendant wouldn't be credible on the stand. Did she say, you know, any other thing, or did she just say, I don't recall your, your honor going rely, relying on the brief. I, the people submitted the APD stated that she found no evidence that the defendant's interview has been tampered with and decided not to conduct a review of the tape based on that. She testified that the defendant clearly understood and waived his Miranda rights on the video. On the condition that he received medical attention first and that she chose not to file a motion to suppress as to the house for, I'm sorry, for the house he was ultimately arrested in because that would have been. Right. And all of those things sound fine. The, the, you know, the tampering is kind of a silly thing, right. And she could decide she didn't want to destroy the defense team's credibility by, by claiming it was or somebody who's wearing a mask. I get you on that, but on a secret violation, you've got, you've got an officer on video taking an unworn statement on video. I don't even know if you need the defendant to prove that you've got an unworn statement before. Well, that's redundant. A statement before Miranda rights were given that tied him to this murder. And then the, the moment after he does that, you Miranda. So that is at least, you know, whether this would have ultimately won, I, you know, who knows curative measures, all those things, but on its face, that is exactly what you're not supposed to do under Siebert. Right. At least on its face, putting aside curative measures, putting aside these other things. That's exactly, exactly what is prohibited by Siebert. Isn't it? Your Honor, the, what, what's prohibited by Siebert, at least in Illinois under Lopez is to intentionally engage in that sort of conduct. Okay. I, I, I agree with that. I'm sorry, finish your answer. Go ahead. Oh, as to whether, understanding your question better now, your Honor APD, he did not give us an explicit reason why she did not file a motion under Siebert. Yeah, that is that we did begin with. Sorry. As to the, the Siebert analysis, the, the, the operate, the operating reasoning under Siebert is that it's all about coercion, much like under Arizona v. Moran, or Miranda. The idea being that any counter, counteractive measures taken by the Miranda warning, when given directly after the person confesses would have no effect. It wouldn't do anything to relieve the coercive atmosphere, which is what Miranda was seeking to prevent. In this case, your Honor, briefly stating this is what you told me before, this is your Miranda warnings, that, that, that is an entirely different situation, your Honor, because the, there was no intent to wear defendant down. There was no intent to get past this coercion. That was perhaps not the cleanest interview, but it certainly wasn't an attempt to coerce defendant or to get around. Okay. But counsel, I, I appreciate what you're saying. I don't mean to be harsh when I say this, but you don't know that. I mean, we're, we're talking about a preliminary crankle hearing, but we're looking at possible neglect. We have an unwarranted statement on video. We don't even have to take anyone's word for it. It happens before our very eyes. That's at least the I have no idea if they did it on purpose. I have no idea what the outcome of a motion to suppress would be in that situation. I don't think anybody does. I don't think Judge Reddick did. How, how could any of us know that at this point? But isn't, and, and, and, and nor did defense counsel give any reason why if she had, again, I'm repeating myself. If she had said, oh yeah, there's a reason we didn't do that. We like self-defense. We didn't mind these, or we thought the defendant would end up having to testify. Fine. I mean, all that is fine, but she, I think it was a she, right? She didn't say that. She didn't really say anything. And I think it's because she didn't have a memory of it. And that's fine if she didn't have a memory, but isn't that why we have a full hearing? Isn't that why we say, okay, we need to get to the bottom of this. We've got what looks to be at least an arguable secret violation. Let's, let's get the, the, trial lawyers where they do remember. Okay. Let's give this prisoner who is doing this all on his own, a lawyer to litigate this. Let's bring in the defense attorneys and ask them, why'd you do it? Isn't that the whole purpose of advancing from a preliminary crankle hearing to a full-blown when there's a question here that you can't resolve at the preliminary stage? It's not spurious or frivolous? Your Honor, I believe there were a few parts to that question. So if I could take that one. Your Honor, as, as, as to the first part, whether or not the, the, the motion would have legal merit, as, as the court held and the Supreme court held in Roddus, the trial court was at the defendant's discretion to look at both the factual merits and the legal merits of a defendant's motion. The trial court was there to, the court observed the officers, they observed the video, they observed the defendant. Knowing somebody's intent is always, or at least almost always an exercise in inference and circumstantial evidence. I, the people's position is that based on that, the court has sufficient information to, uh, at, at the crankle hearing to say that there was not sufficient evidence to believe that the police officers engaged in this intentionally, especially considering what the court, uh, the Illinois courts have held as factors to look at and, and therefore APDE was correct to not perceive this. Furthermore, as to the, the specific, uh, reasoning and moving to the second stage in order to fully flesh it out. Your Honor, at, at, at this point, the, the inquiry that this, that, that the court was at the frivolous, uh, as the court saw APDE and her team, I believe there were two names, but there were possibly three attorneys working on this, uh, reviewed the case, reviewed the confession, saw this every way that the people's position is it was a reasonable determination by the court to decide that this did not suffer from neglect. Okay. And she based that on what she didn't based on trial strategy. She did, she, or did she, we don't really know what she based it on. Do we, uh, the trial court based its decisions on finding that the state merit, the motion wouldn't have merit. Would not have merit. Okay. And I don't actually recall. And I'm not saying that the judge has to say why I'm just trying to remember why I read in the motion to reconsider that she said that she would not have merit. I'm just stating that the defendant said it's equally possible that he blurted it out, or that he was improperly asked that first time. Um, there was no mention of the video itself, where it's clearly an unwarranted statement. And, um, if it's equally possible that there was a Miranda violation the first time around or not, if the, if the defendant's version of the case and the state's version of the case is equally possible that a preliminary Frankel, you think state wins and they toss it and say, no need to look further. Well, your honor, as the, I apologize, your honor, the purpose of reviewing the court's decision is not to look at its specific stated reasoning. Uh, as, uh, your honor pointed out, the, the trial court wasn't obliged to give it its reasoning at all. The question is whether or not it made the correct decision on the merits given the record and whether or not that decision was manifestly. Okay. Well, what was that a finding of fact that it's equally likely that there was, or was not a violation of his rights off camera before they got into the room? Okay. Your honor, as, as to whether that's a finding of fact, um, the, the people's position is that was just that that was a statement that gave it supportive of it. Okay. Fair enough. That's fair, but she was right, right? I mean, it's equally likely. I mean, we don't have to guess whether there was a previous statement because when the officers came in, that's the first thing they reminded him of is that you said something off camera. So we don't have to guess whether there was, or was not an off-camera statement that was unwarned. We just have to wonder to ourselves, well, did they, did he blurt it out? I don't think they said that they Mirandized him, but they, um, did he blurt it out or did they ask him a question that was designed to elicit an incriminating response, which would make it a custodial interrogation with Miranda protections. I mean, she's right, right? We have no way of knowing it was one or the other. We don't know which one at this preliminary crankle. If it could be one or the other, we say we don't need to go any further. We're done. And you lose defendant is equally likely. I mean, that makes it sound like it's a preponderance of the evidence standard at the preliminary crankle hearing, which is not how I understand it. What am I missing? Well, your, your honor, the, again, the stated reasoning that the trial court gave is not what is at issue on this appeal. The issue on this appeal is whether or not a defendant raised an issue that had possible legal or factual merit that showed APDE possibly neglected the case. It's not examining whether or not the stated reasons that the court gave were necessarily accurate or stated the correct standard for what they were to find. It's whether or not the evidence was there. Yeah. I'm not suggesting otherwise. I'm not trying to hang around our words, but those words are right. I mean, those words accurately describe the state of this case. I mean, we, we have one, one unworn statement that we don't even have to ask questions about. I mean, it's on video and it's a Miranda violation, but even if we put that aside, the other one, we don't know yet. Maybe it was improper. Maybe he blurted it out and the police did nothing wrong. We just don't know whether she says it or not. That's the thing hanging out there. And in my view, we don't know. So if we don't know, why are we erring on the side, tossing this preliminary state, instead of giving it a full area, we can find these things out. It won't be hard. Ask the police officers, ask the, you know, give this guy a lawyer, ask the defense attorneys to come testify. They'd probably need to refresh the recollection, which it doesn't appear she had done very much of before because she couldn't remember very much. I get it. I get it. But why not have a full hearing? Let them be prepared. Let the police officers testify. Let the defendant testify if he wants to, and let's figure this out rather than be guessing about it. Well, your Honor, as the people, as we noted in our brief, even taking defendant's version of events, and even if you take him completely at his word, there would not have been enough to raise a meritorious motion to suppress. Furthermore, as has been pointed out multiple times throughout this hearing, this was far from the, not even the only evidence of defendant's guilt. This was not the only time defendant confessed. And the other time he confessed, defendant does not challenge at this hearing. So even taking defendant completely at his word, the people's position that he didn't allege enough to make a possible violation or to show a possible violation, and that ultimately, just as a matter of trial strategy, that it wouldn't have been meritorious either. There simply was not enough to show. Okay. All right. Thank you very much, counsel. Okay. I have some questions for you, Mr. Erb, and I'm going to take issue with something that my colleague just mentioned about this first statement that this detective refers to. Now, there's a statement that this gentleman made in a car. Nobody's even contesting that he made that statement and that he made it. He blurted it out. Now, is that a Miranda violation? Your Honor, it is not. All right. Now, is there, what is in this record now that besides the statement that Sadarsky says, you told us earlier that this was all in what evidence is in this record that that was a Miranda violation if this individual did exactly what he did in the squad car? How is that a Miranda violation? Your Honor, it's the people's position that what the statement that defendant gave to Officer Woodwick in the car by initiating a conversation to him was not a Miranda violation. Gone with that. I'm not talking about that anymore. I don't think there's any question that when somebody gets in the squad car and says something to the officer and the officer says something back that that's a Miranda violation. Now, I'm talking about this statement Sadarsky refers to. Where in this record is there any evidence that this statement wasn't volunteered just like the squad car? Where's the evidence of this? Your Honor, within the record other than defendant's pro se letter that he initiated. The teacher stated that they asked me questions first and then warned me. Is there anything else in this record that shows that that statement that was made to Sadarsky before they turned on the tape that that was done in violation of Miranda? To my recollection, no, Your Honor. Okay, so you're not conceding that this statement out wherever it was was a Miranda violation, are you? No, Your Honor. Now, going to the statement that the defendant made to his lawyers, he makes a statement that he says they got me to give a statement and then they warned me. Isn't that what his pleadings are or whatever he said in his pro se thing? This is what the in a vacuum and that is the sole determiner or determining factor of whether or not this lawyer showed possible neglect. No, Your Honor, the trial court. What do we look at? Look at the record? Yes, Your Honor. The trial court was well within its right to look at the proceedings of that trial. Well, doesn't Rodas say that the trial judge can look at the entire record of proceedings if the judge determines something is a matter of trial strategy, it may not appoint counsel and go further with Krenkel? And doesn't Rodas also say that if the court looks at the facts and the legal issues, it can also dismiss or deny appointment of counsel? That is correct, Your Honor. And your position is we're looking at this from a manifest weight? Yes, Your Honor, that the court would need to, this court would need to find that the trial court committed a manifest error in its determination. You know, the Rodas decision first says that generally we review de novo whether a pre-Krenkel hearing is correctly done. And then at the end of the decision, they say that this court didn't abuse its discretion. So I'm not sure. I do, I mean, that decision has a de novo at the beginning and an abuse of discretion at the end. Mr. Krieger, I think thinks it's de novo. So that's an issue certainly for all of us, whether we're looking at this de novo or manifest weight, but your position also is, is that if it's a substantive matter, which I think this might be, whether to file a motion to suppress or not, I don't think that's procedural that we're going to look at that for manifest weight. Your Honor, that, that, that is our position that Rodas held that it would be de novo review to determine whether or not the procedure was, whether the procedure, which is the operative word was correctly held. For example, earlier within the history of this case, defendant, the court engaged in a preliminary Krenkel hearing where it permitted the people to ask questions. So that was, that would have been a de novo review because the defendant argued correctly that there was a default with the, or I apologize, a defect with the way that the procedure was held in this case. And this is following Illinois case law, both at the, the intermediate level and at the Supreme Court level that once the court makes a determination of the merits of the case, which it did in this case, because it found that a defendant did not bring a meritorious claim that it's a manifest error statement. Okay. Well, I don't have any other questions. Would either of the judges wish to ask questions based on any of my questions? No, thank you. No. All right. Okay. Thank you, Mr. Erb. And now we're going to return briefly to Mr. Krieger. Thank you. Thank you. I just have two points. First, to answer Justice Altsch's question, yeah, the ruling, the circuit court's initial ruling, not the ruling in the motion to reconsider, didn't find that there was strategy. It was just a decision that they didn't, that counsel didn't file it because they lacked merit. And it wasn't the claims for, the ruling was very generic, just referred to general motions, didn't discuss Siebert, didn't say that there was a specific strategy. The second point that I have, both in counsel contrast this case with other Siebert cases where the officers ground down the defendant, got a very detailed statement, and then kind of presented a more streamlined statement. So factual overlap is one of the considerations in whether measures were taken, but all the other factors go the other way. The passage of time in this case was comparable to the passage of time in Lopez. It's at the same place with the same detectives. The details were used as part of the Miranda, the Miranda waiver itself was tainted by the use of the details, which was videotaped. And my client was not advised that his first statement could be used against him. Unless your honors have any questions, we would ask for this question to remain. Any further questions by the panel members? No. All right. Well, thank you both. Thank you, Mr. Krieger. Thank you, Mr. Erb. It's well-argued, well-briefed, and we will take the matter under advice. Thank you both.